**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**NEW BERN DIVISION**

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 24-04510-5-JNC |
| THE LITTLE MINT, INC. ) | |
| ) | Chapter 11 |
| Debtor. ) | |

**DECLARATION OF KENNETH K. MOORE IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Kenneth K. Moore, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1. I am the President of The Little Mint, Inc. (the "Company" and/or "Debtor"), the above-captioned debtor-in-possession. The Company formerly did business in three separate companies, namely Moon Unit, Inc., Dlyan James Management, Inc. and A. and E. Vends, Inc. On July 27, 2023, Articles of Merger were filed with the North Carolina Secretary of State merging the three corporations into one surviving entity, The Little Mint, Inc. (the "Debtor").

2. I serve as President of the Debtor and I am familiar with the day-to-day operations as well as the business and financial matters, books and records, and employees of the Debtor.

3. Except as otherwise indicated, all statements in this declaration (the "Declaration") are based upon (a) my knowledge as President; (b) my review of relevant documents, including the Debtor's books and records, (c) information supplied to me by other members of the Company's management team and/or third-party advisors, (d) my opinion based on my lengthy experience and knowledge of the Debtor's operations and financial affairs, and (e) my experience and knowledge concerning the restaurant industry generally.

4. As President, I participated in the decision to cause the Debtor to file a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, §§ 101-1532 (the

"Bankruptcy Code"). I authorized the bankruptcy filing and the Debtor filed this case (the "Chapter 11 Case") on December 31, 2024 (the "Petition Date").

5. To minimize any adverse effects on its business as a result of the commencement of the Chapter 11 Case, the Debtor has filed certain contemporaneous motions seeking "first day" relief (collectively, the "First Day Motions").

6. The goals of the First Day Motions, among other things, are to: (a) continue with the Debtor's operations in the ordinary course of business while operating in chapter 11 with minimal disruption; (b) maintain the confidence and support of key constituencies; and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases. I have reviewed the First Day Motions, and I believe that the relief they request is necessary to avoid immediate and irreparable harm to the Debtor's business and estate from the filing of the Chapter 11 Case.

7. I am authorized to submit this Declaration on behalf of the Debtor in support of the First Day Motions, and to provide additional background regarding the events leading to the filing of the Chapter 11 Case and the Debtor's efforts to maintain the value of its restaurant chain.

8. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents, or opinion.

I. **GENERAL BACKGROUND**

A. **The Chapter 11 Case**

9. As discussed above, the Debtor commenced the Chapter 11 Case on this date by filing a voluntary chapter 11 petition in the United States Bankruptcy Court for the Eastern District of North Carolina (the "Court").

10. The Debtor continues to operate its business and manage its locations as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**B. General Background**

11. The Little Mint, Inc. is a North Carolina corporation, headquartered in Mount Olive, North Carolina, that operates a fast casual restaurant chain known as "Hwy 55 Burger Shakes & Fries". In addition to its corporate office, the Debtor currently has 93 locations, consisting of 22 corporate-owned stores and 71 franchised stores. Prior to filing, the Debtor closed 13 corporate-owned stores.

12. The stores are located primarily throughout the Southeast, with operations in North Carolina, South Carolina, Georgia, Florida, Tennessee and Texas. I founded the Company thirty-four (34) years ago in 1991 in North Carolina, which began as one restaurant called "Andy's Cheesesteaks & Cheeseburgers". I named the restaurant after my two-year-old son, Andy, and cooked every burger during our first year.

13. For two decades, I continued to grow our operations, ultimately expanding to include franchisees in 2012, when we rebranded to "Hwy55 Burgers Shakes and Fries". Many of our franchised stores are owned by former managers of our corporate-owned stores. Our corporate culture is based on "Love your Neighbor" and we promote respect, courtesy and a philosophy of servant leadership.

**C. Corporate Governance Structure and Recent Operating Results**

14. I own 100% of the shares in the Company.

15. The Company's annual revenues in 2023 were approximately $24.4 Million. The Company has operated at a loss for years 2022 and 2023.

### D. Debt Structure

16. As stated in the Cash Collateral Motion, it appears that certain proceeds generated from the Debtor's continuing operations may constitute cash collateral of the U.S. Small Business Administration (the "SBA"), Johnson Breeders, Inc. ("Johnson Breeders"), CSC, Institution Food House, Inc. ("Institution Food"), and Performance Food Group, Inc. ("Performance Food") (collectively, the "Secured Parties") within the meaning of § 363 of the Bankruptcy Code. Each of the Secured Parties appears to assert a security interest in, among other things, the Debtor's inventory, payment intangibles, payment card receipts, and/or general intangibles, and proceeds thereof.

17. The Debtor is party to a substantial amount of equipment and real property leases associated with each location.

18. The Debtor does not own any real property.

19. The Debtor estimates that it has approximately $11,000,000 of secured debt and $5,800,000 of trade and other unsecured debt as of the Petition Date.[1]

### E. Events Leading to the Chapter 11 Cases – History of Operations and Expansion

20. As noted earlier, in 2012 the Company rebranded to "Hwy55" and franchised its stores, while still maintaining some corporate-owned stores. Around 2018, my son Andy and I made the decision to expand the Company, using a new prototype for our restaurants. Historically, our restaurants had been primarily located in strip malls. We decided to move to a new model of

---

[1] This amount is approximated based on information reasonably available to me as of the preparation of this Declaration and may not reflect payments made or debts incurred in the ordinary course of business in the immediate period leading up to the filing of the Chapter 11 petition. The Debtor will update this figure in connection with the filing of the Schedules and Statements (as such terms are defined herein).

4

stand-alone buildings with pick-up windows to bring the Company more in line with modern trends and to remain competitive in the restaurant industry.

21. In 2019, we worked to secure financing from Fifth Third Bank, which was intended to be a $5,000,000 line of credit to cover equipment packages, as the Company had entered into contractual obligations to open multiple new stores in 2019. Unfortunately, the financing never materialized.

22. In addition to losing the financing opportunity, our expansion effort coincided with multiple headwinds, beginning with the worldwide Covid pandemic starting in early 2020.

23. The pandemic caused significant delays in opening the new stores. Between 2021 and 2024, the Company opened thirty (30) new stores with no traditional financing, in part because of the contractual obligations to continue to open new locations.

24. Additionally, as many industries experienced, Covid created a substantial labor shortage in part due to government relief programs and wage increases. The Company had difficulty staffing the new locations, the majority of which were in small towns throughout the southeast and we did not want to increase our product prices. A large demographic of our customer base is dependent upon fixed incomes and we have found any price increase substantially impacts sales to our customers. As our competitors were able to raise prices and increase wages, we maintained menu prices at pre-covid numbers.

25. As we continued to open stores, the Company also faced inflated prices for equipment packages, due to supply chain issues. For example, equipment contracts that originated at $225,000 increased to over $375,000 by the time a new location would open. The company was also plagued with rising costs of goods, due to both supply chain and inflation.

26. The Company continued to seek traditional lending in 2022 and 2023, but upon the collapse of Silicon Valley Bank, many of the banks our Company was working with pulled back on funding offers.

27. To that end, the Company's expansion efforts were funded with high interest loans and personal funds from myself and my wife, including the entirety of our 401k retirement accounts, our personal savings, stocks and life insurance, and the proceeds from the sale of our retirement home.

28. Finally, approximately a year prior to filing, it was discovered that the Company's in-house accounting department was failing to make regular payments for utilities, taxing authorities and other ordinary course payments and generally mismanaging the Company's finances. Upon discovery, the accounting department was immediately exited and replaced with a competent bookkeeping team; however, significant errors had been made.

29. In the months leading to the Petition Date, the Company has struggled to recover from the multiple financials hardships it has faced over the past several years. The filing was precipitated by creditor payment demands, collection efforts from the North Carolina Department of Revenue and the expiration of an Amended Forbearance Agreement with former food distributor, Performance Food Group, Inc. ("PFG"), which threatened to file a confession of judgment against the Company and myself.

30. The Company was unable to satisfy payment demands from select creditors, given its cash position, and ultimately filed on December 31, 2024 for the benefit of all creditors and in light of the PFG confession of judgment threat.

## II.     THE FIRST DAY MOTIONS

31.     The Debtor has filed several First Day Motions which address issues necessary to operate during the pendency of this Chapter 11 Case. The Debtor has also requested that the Court conduct a hearing as soon as possible to hear the First Day Motions (the "First Day Hearing"). A description of each of the First Day Motions is provided below.

### A. Motion for Entry of an Order (I) Extending the Debtor's Deadlines to File Lists of Equity Holders, Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief.

32.     The Debtor requests the entry of an order, pursuant to sections 105(a) and 521 of the Bankruptcy Code and Rules 1007 and 9006 of the Bankruptcy Rules, setting a deadline forty-five (45) days after the Petition Date by which the Debtor must file its respective schedule of assets, liabilities, and executory contracts and unexpired leases, and statement of financial affairs (collectively, the "Schedules and Statement") (the "Schedules and Statement Extension Motion").

33.     The additional time requested in the Schedules and Statement Extension Motion should help to ensure that such documents are as accurate as possible. The additional time will also help ensure that the relevant information is fully processed through the Debtor's information systems and can be incorporated into the relevant schedules. Based on the foregoing, and due to the other pressing activities in which the Debtor and their professionals are engaged at this time, I believe that additional time to finalize the Schedules and Statement is warranted under the circumstances.

B. **Debtor's Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtor on account of Prepetition Amounts Due; (II) Deeming Utility Providers Adequately Assured of Future Performance; (III) Authorizing the Debtor to Establish the Adequate Assurance Account and Pay the Adequate Assurance Deposits; (IV) Establishing Procedures for Objection to the Adequate Assurance Procedures; and (V) Granting Certain Related Relief.**

34. In connection with operating their restaurants, the Debtor incurs utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, waste disposal, natural gas, telecommunication, phone, internet, and other similar services (together, the "Utility Services") from various utility companies (collectively, the "Utility Providers").

35. The Debtor requests (the "Utilities Motion") that the Court enter an order: (1) prohibiting the Debtor's Utility Providers from altering, refusing, or discontinuing services to, or discriminating against, the Debtor on account of prepetition amounts due; (2) determining that the Utility Providers are adequately assured of future payment; (3) authorizing the Debtor to establish an adequate assurance deposit account and to pay an adequate assurance deposit in the amount of the average monthly costs for Utility Services; and (4) establishing procedures by which parties-in-interest may object to the relief sought in the Utilities Motion.

36. The non-exclusive list of Utility Providers and Adequate Assurance Chart attached as Exhibit A to the Utilities Motion is correct and accurate to the best of my knowledge. The Debtor proposes to provide deposits equal to the average monthly bill as reflected in Utility Provider Chart to Utility Providers as adequate assurance of payment (the "Proposed Adequate Assurance"). The Proposed Adequate Assurance is calculated based on the Debtor's average utility expenses over the six-month period.

37. Uninterrupted Utility Services are essential to the Debtor's ongoing business operations and, hence, the overall success of this Chapter 11 Case. The Debtor's corporate-owned

restaurants operate at approximately 22 locations along with the Company's corporate headquarters, all of which require electricity, telecommunications, internet, water, waste management (including sewer and trash), and other utility services to operate. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely impacted, and such disruption would jeopardize the Debtor's ability to administer the Chapter 11 Case by adversely affecting customer goodwill and employee relations, which, in turn, will negatively affect the Debtor's revenues. Accordingly, it is essential that the Utility Services continue uninterrupted during this Chapter 11 Case.

### C. Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing the Debtor to Pay and Perform All Employee Obligations, (B) Directing Banks to Honor All Related Employee Obligations, and (C) Granting Related Relief.

38. The Debtor has requested that this Court enter an order (I) authorizing (a) payment of pre-petition wages, salaries, and employee benefits, (b) reimbursement of employee business expenses, and (c) payment of other employee-related amounts; and (II) authorizing applicable banks and other financial institutions to receive, process, honor, and pay all checks and drafts drawn on debtor's bank accounts relating to the foregoing (the "Wage Motion").

39. Regarding the Debtor's current employees, the continued maintenance of employee pay and benefits is essential to the ongoing and valued services of the Debtor's employees. Accordingly, the Debtor has sought authority to pay certain pre-petition obligations to its employees. These pre-petition obligations include various sums for: wages and salaries, federal and state withholding taxes, payment of health insurance premiums and all other employee benefits that the Debtor pays in the ordinary course of business as described in the Wage Motion (collectively, the "Employer Obligations"). Furthermore, as a service to its employees, the Debtor withholds certain amounts from its employees' paychecks for the benefit of designated recipients

9

for various purposes, including, without limitation, the payment of wage garnishments. The Debtor withholds such amounts and pays them directly to the appropriate entity.

40. As of the Petition Date, the Debtor's workforce consists of approximately 530 employees (the "Employees"), 30 are salaried, and approximately 500 are paid on an hourly basis. The Debtor pays its employees directly, by direct deposit and check.

41. The Employees are not unionized.

42. In order to ensure that its current employees are paid in the ordinary course when compensation payments become due, the Debtor has specifically requested that the order approving the Wage Motion also provide that the applicable banks are authorized to service and administer the accounts as described above without interruption, and, in the ordinary course of business, to receive, process, honor, and pay any and all electronic or wire transfers, checks, and drafts drawn on the Debtor's accounts, whether presented for payment before or after commencement of these Chapter 11 Cases by the holder thereof, provided that sufficient funds are in the Debtor's accounts to cover them.

43. **Wages, Salaries and Compensation.** The Employees are paid wages (collectively, the "Wages"). All employees are paid semi-monthly.

44. As of the Petition Date, the Company's gross semi-monthly payroll is $77,587.73 for salaried employees and $150,000.00 for hourly employees.

45. The next upcoming pay date for the semi-monthly employees is January 7, 2025. The aggregate payroll for the semi-monthly payroll on January 7th, covering the period of December 16th through December 31st, will be approximately 227,587.73, of which all may be deemed to have arisen pre-petition.

45. As of the Petition Date, approximately all gross Wages are accrued and owed to Employees on the payroll dates noted above. As more fully described in the Wage Motion, the Debtor requests authority to pay all unpaid Wages to the Employees and to continue to otherwise pay the Employees in the ordinary course of business.

46. As of the Petition Date, the Debtor has also accrued $17,410.46 in pre-petition payroll tax obligations that constitute the company's share of payroll taxes. The Debtor seeks authority to honor and process its pre-petition obligations with respect to the payroll taxes, including authority to pay the payroll taxes to the applicable taxing authorities, as needed.

47. **Employee Benefits.**  The Debtor has established certain benefit plans for eligible Employees, including without limitation medical, dental, and vision plans, workers' compensation insurance, life insurance, and other benefits described in more detail below (all together, the "Employee Benefit Plans"). In general, all full-time Employees are eligible to participate in the Employee Benefit Plans after ninety days of employment. The Employee Benefit Plans include the following:

48. The Debtor provides eligible employees with medical insurance benefits through a Group employee plan with Blue Cross Blue Shield and wishes to continue paying the monthly insurance premiums in the amount of approximately $15,497.00.

49. By the Wage Motion, the Debtor seeks authority to continue to provide the Employee Benefit Plans outlined above and in the Wage Motion; to pay, in the ordinary course of business, any obligations, charges, fees and premiums that may arise, or that may have arisen, under the Employee Benefit Plans, whether accrued pre- or post-petition; and to authorize Banks to honor checks that were issued pre-petition relating to the Employee Benefit Plans.

50. **Worker's Compensation Insurance.** The Debtor maintains workers' compensation insurance to provide Employees with coverage for claims arising from or related to their employment, and to satisfy the Debtor's obligations arising under or related to any claims in connection therewith, through Employers Assurance Company. The Debtor's total annual Workers' Compensation Insurance premium for its most recent policy period was approximately $143,771. The present policy term for the Debtor's Workers' Compensation has been paid in full. The Debtor intends to renew its policy next month, and anticipates that the premium price will change significantly due to recent head count reductions. The Debtor requests authority to continue to maintain its Workers' Compensation Insurance Policy in the ordinary course of business.

D. **Debtor's Emergency Motion for Authorization to Use Cash Collateral pursuant to 11 U.S.C. §§ 361, 363 and 506(c).**

51. As noted herein, various secured creditors assert liens on all or substantially all of the Debtor's assets, including the Debtor's cash. One of the Debtor's pressing concerns is the need for the immediate use of cash subject to the creditors' liens (the "Cash Collateral"). The Debtor requires the use of Cash Collateral in order to meet its expenses and maintain the operation of its business. Without the use of Cash Collateral, the Debtor's operations will be substantially and irreparably harmed, and the continued successful operation of the Debtor's business is essential to its operations during this case. In order to avoid immediate and irreparable harm to the Debtor's estate, the Debtor requires the use of Cash Collateral to pay, among other things, payroll, utilities, taxes, insurance, post-petition vendors and other ordinary business costs and expenses.

52. Accordingly, the Debtor requests authority to utilize cash collateral generated by the Debtor's business (the "Cash Collateral Motion") pursuant to a budget setting forth its

anticipated receipts and disbursements during the initial phase of this Chapter 11 Case, which will be provided prior to the interim hearing.

53.     As adequate protection for any interest in Cash Collateral which the secured creditors may have, the Debtor is willing to grant the secured creditors replacement liens in the Debtor's post-petition Cash Collateral, to the same extent, priority and validity as its pre-petition liens as further described in the Cash Collateral Motion. The proposed replacement liens should provide sufficient adequate protection to prevent any diminution in value to the collateral.

54.     Finally, in order to avoid immediate and irreparable harm caused by the inability to utilize Cash Collateral, the Debtor further requests that the Court schedule an interim hearing on the Cash Collateral Motion.

**E. Debtor's Motion for Entry of an Order Authorizing the Debtor to Honor Certain Prepetition Obligations to Customers, and to Continue Certain Customer Programs.**

55.     The Debtor seeks an order authorizing it to honor or pay certain pre- petition obligations to its customers in the ordinary course of business (the "Motion to Honor Gift Cards and Customer Programs").

56.     Prior to the Petition Date and in the ordinary course of its business, the Debtor engaged in certain practices to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace. These practices include, but are not limited to the following: (i) a gift card program (the "Gift Card Program"); (ii) punch cards and rewards application program (the "Loyalty Program"); and (iii) coupons/discounts (the "Discount Program" and, together with the Gift Card Program and the Loyalty Program, the "Customer Programs").

57.     The Customer Programs, which are commonplace in the restaurant industry, are described in detail in the Motion to Honor Gift Cards and Customer Programs. The common goals

13

of Customer Programs are to meet competitive pressures, ensure customer satisfaction, and generate brand loyalty and goodwill for the Debtor, thereby retaining current customers, attracting new ones, and ultimately improving the going concern value of the business.

58. The Debtor utilizes a company called Paytronix to facilitate the sale and redemption of gift cards. The funds from all gift card sales go into a single account (the "Gift Card Account") which is controlled by Paytronix, regardless if the gift card was purchased from a corporate-owned location or a franchised location. Gift cards may be purchased and redeemed at any location, regardless of the point of sale. When a card is sold, funds are transferred from a store's account directly into the Gift Card Account. Profit is not realized when a gift card is sold, but only when a gift card is redeemed. As of the Petition Date, the amount of outstanding Gift Card Account totaled approximately $258,881.05. However, only $43,912.32 of this total has been sold in the last 24 months, leaving $214,968.73 as "stale" gift cards.

59. Under the Loyalty Program, the Debtor issues customer loyalty rewards through physical punch cards. Customers can redeem the card for various menu items after a certain number of purchases. Historically, the Debtor also offered an online Rewards Program; however, that program has been phased out in lieu of the simplified approach of punch cards.

60. As of the Petition Date, the Debtor has reached out to all loyalty members and redeemed all points. The Debtor anticipates that all these credits have been redeemed due, in part, to the phase out of the program overall. The Debtor envisions the punch card program to continue post-petition.

61. Occasionally, the Debtor will issue targeted discounts in order to increase sales and obtain new customers (e.g., offers of discounts to students at nearby colleges or senior citizens). These discounts range from 5% to 10%.

62. The Debtor also occasionally prints coupons in flyers for specific locations, sends coupons by email blasts, and offers various other promotions and discounts

63. The Debtor wishes to continue the Customer Programs post-petition in the ordinary course of its business, which have been beneficial to its business (i.e. by honoring accrued awards, punch cards and outstanding gift cards). Such relief is necessary to preserve the Debtor's critical customer relationships and goodwill for the benefit of the estate.

64. The Debtor has accounted for honoring extant gift cards, punch cards, loyalty rewards and discounts in their budget and believe that maintaining the Customer Programs will preserve the going concern value of the business.

**F. Debtor's Omnibus Motion Seeking Entry of an Order (1) Authorizing (A) The Rejection of Certain Unexpired Leases and (B) Abandonment of Certain Personal Property, if Any, Each Effective Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief.**

65. The Debtor seeks an Order authorizing the Debtor to reject certain unexpired leases (the "Motion to Reject Leases").

66. As noted above, prior to the Petition Date, the Debtor identified certain restaurant Locations, that were unprofitable and did not fit into the Debtor's go-forward strategy, and subsequently closed approximately 13 locations (i.e. the Exit Stores).

67. The Debtor is the counterparty to several leasing arrangements covering certain real property formerly used in connection with its pre-petition operations at the Exit Stores (the "Exit Leases"). In order to avoid any unnecessary administrative obligations which may arise under the Bankruptcy Code, the Debtor seeks authority to reject the Exit Leases as of the Petition Date. All of these stores were either unprofitable, geographically undesirable or subject to overmarket leases. The Debtor has ceased operations at the Exit Stores and has either completely or

substantially vacated the premises or is in process of vacating. In some locations, the Debtor has secured and removed personal property that, in its best business judgment, had more than a de minimis value to the Debtor and its estate. In addition, the Debtor has identified other leases on Exhibit A to the Motion to Reject Leases that are a burden on the Debtor's cash flow and financially undesirable. Rejection of all of the Leases identified on Exhibit A to the Motion to Reject Leases will allow the Debtor to increase profitability.

68. The Debtor believes that the requested relief is vital to preserving the value of the estate.

### G. **Debtor's Application for Approval of Officer and Director Compensation.**

69. The Debtor seeks Court approval to compensate me as the Debtor's President in accordance with my pre-petition compensation arrangements. As President, I hold a critical operational, leadership and corporate management position within the Debtor's business. I am responsible for, among other things, overseeing the accounting department, new store development, managing store operations and franchise relations, reviewing and executing equipment purchases and leases, managing training, conducting monthly in-person meetings, and creating company videos for employee development for all locations. Additionally, I am involved in essential day-to-day and strategic business functions, formulating and executing the Debtor's business plans, leading and providing strategic direction to the Debtor's employees, implementing the operational goals of the Debtor's Chapter 11 Case, assisting in maintaining the Debtor's books and records, assisting the Debtor's bankruptcy counsel in preparing essential reporting documents, and providing critical strategic and operational leadership in our Company's restructuring. My role as President is vital to the Debtor's reorganization efforts. My salary and benefits as requested

in the application are in line with industry standards. Accordingly, I believe the Court should authorize and approve the requested compensation as set forth in the application.

### H. Motion to Establish Limited Notice.

70. The Debtor seeks entry of an order limiting notices to be provided in this Chapter 11 Case. As a result of the significant number of creditors and parties-in-interest in this case, copying, postage, and other expenses associated with mailing of notices as required by the Bankruptcy Code and Bankruptcy Rules would be impractical and would impose an administrative and economic burden on the Estate. The limited notice proposed by the Debtor is in the best interest of the Debtor's Estate as it will save time and expenses associated with giving notice of all matters to every creditor and other parties-in-interest, while preserving the right to receive notice for any party who wishes to receive notices (by filing an appropriate request), and will not otherwise prejudice the right of any creditor or party in interest.

### I. Application of the Debtor pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2014(a) for an Order Authorizing the Employment and Retention of Hendren, Redwine & Malone, PLLC as Bankruptcy Counsel for the Debtor.

71. The Debtor seeks to employ and retain Hendren, Redwine & Malone, PLLC ("Hendren Redwine") as its principal bankruptcy counsel to represent it as debtor in possession in this bankruptcy case effective as of the Petition Date. Accordingly, the Debtor has filed an application for entry of an order authorizing it to employ and retain Hendren Redwine as its attorney to perform the necessary legal services during this Chapter 11 Case (the "Hendren Redwine Application").

72. The Debtor has selected Hendren Redwine because this case is likely to be complex and will require Debtor's counsel to have extensive experience in chapter 11, restructuring and bankruptcy litigation. Hendren Redwine has extensive experience and knowledge in the field of

reorganization, restructuring, debtors' and creditors' rights, business reorganizations under chapter 11 of the Bankruptcy Code and attendant litigation. In addition, Hendren Redwine has worked with the Debtor pre-petition and become familiar with the Debtor's business and affairs and many of the potential legal issues which may arise in the context of these Chapter 11 Cases. I believe that Hendren Redwine is both well-qualified and able to assist the Debtor in this Chapter 11 Case, and that the firm's retention is in the best interests of the Debtor's estate and its creditors.

### J. Application of the Debtor for an Order Authorizing the Employment and Retention of Omni Agent Solutions as Claims and Noticing Agent for the Debtor.

73. The Debtor requests entry of an order, pursuant to 156(c) of title 28 of the United States Code, authorizing the retention and appointment of Omni Agent Solutions ("Omni") as claims and noticing agent in this Chapter 11 Case (the "Omni Retention Application").

74. I believe that the relief requested in the Omni Retention Application will ease the administrative burden on the Clerk of the Bankruptcy Court in connection with this Chapter 11 Case and assist the Debtor in the administration of its case. Moreover, the Debtor has reviewed the engagement agreement and Omni has agreed to discount its hourly rates. I believe that Omni's rates are competitive and reasonable given Omni's quality of service, expertise and experience.

### K. The First Day Motions.

75. As discussed above, I am familiar with the various types of relief requested in the Debtor's First Day Motions and, for the reasons set forth above, I believe that the relief requested in the First Day Motions is in the best interest of the Debtor and its creditors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 31st day of December, 2024.

/s/ Kenneth K. Moore
Kenneth K. Moore
President of The Little Mint, Inc.
